## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JASON ALDRIDGE Derivatively on Behalf of JELD-WEN HOLDING, INC., <br><br> Plaintiff, <br><br> v. <br><br> MARK A. BECK, L. BROOKS MALLARD, GARY S. MICHEL, KIRK S. HACHIGIAN, MATTHEW ROSS, WILLIAM BANHOLZER, MARTHA BYORUM, GREGORY MAXWELL, ANTHONY MUNK, SUZANNE STEFANY, BRUCE TATEN, RODERICK WENDT, STEVEN WYNNE, and PATRICK TOLBERT <br><br> Individual Defendants, <br><br> -and- <br><br> JELD-WEN HOLDING, INC., a Delaware corporation, <br><br> Nominal Defendant. | Case No. 1:21-cv-00135-RGA |

## AMENDED VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Jason Aldridge ("Plaintiff"), by his attorneys, submits this Amended Verified Stockholder Derivative Complaint for violations of securities laws, breach of fiduciary duty, waste of corporate assets, and unjust enrichment. Plaintiff alleges the following upon information and belief, except as to the allegations pertaining to Plaintiff, which are based on his personal knowledge. This complaint also is based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the SEC and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant JELD-WEN Holding, Inc. ("JELD-WEN" or the "Company") against members of its board of directors (the "Board") and members of upper management. The wrongdoing alleged herein caused substantial damage to JELD-WEN's reputation, goodwill, and standing in the business community and has exposed JELD-WEN to substantial liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein also damaged JELD-WEN in the form of, among other things, millions of dollars in losses to the Company's market capitalization.

2.      This action seeks to remedy wrongdoing committed by JELD-WEN's directors and officers from January 26, 2017 through the present (the "Relevant Period").

3.      JELD-WEN is a vertically integrated global manufacturer and distributor of doors and windows that operates facilities in 20 countries. The Company designs, produces, and distributes a range of doors, windows, and related products.

4.      The interior molded door is the most popular type of interior door in North America. Manufacturers produce interior molded doors by joining two doorskins over a wood frame filled with a hollow or solid core. Doorskins are the principal component of interior molded doors, accounting for up to 70% of the cost to manufacture a molded door.

5.      JELD-WEN and its primary competitor, Masonite Corporation ("Masonite"), have in the recent past been the two largest manufacturers of doorskins in the United States. As of 2012, there was only one other competitor in the doorskin market – Craftmaster Manufacturing, Inc. ("CMI").

6.      In October 2012, JELD-WEN tried to acquire CMI. Through that acquisition (the "CMI Acquisition"), JELD-WEN was poised to gain ownership of CMI's flagship doorskin manufacturing plant in Towanda, Pennsylvania, thereby removing CMI as the third source of doorskin supply in the interior molded door market and removing it as a competitor in the market for the sale of interior molded doors.

7.      The Department of Justice ("DOJ") had previously objected to another company's attempt to acquire the same Towanda manufacturing plant, noting that the proposed acquisition would "tend substantially to lessen competition by making it easier for the remaining firms in the relevant markets to engage in coordinated interaction that harms consumers." The DOJ permitted that acquisition to go forward, however, only after the Towanda doorskin plant was completely divested and spun off to create CMI - a third competitor in the interior molded doors and doorskins market.

8.      Mindful of the antitrust risks in acquiring CMI, JELD-WEN developed a plan to circumvent the DOJ's potential objections. The Company entered into long-term supply agreements with independent door manufacturers (the "Independent Door Manufacturers") for the supply of doorskins. These agreements were intended to alleviate the concerns of both the DOJ and the Company's customers regarding JELD-WEN's ability to exploit its dominant market share.

9.      The plan worked and, noting the lack of objection from JELD-WEN's customers, the DOJ permitted the Company's acquisition of CMI. The CMI Acquisition closed on October 24, 2012, leaving only two doorskin manufacturers – JELD-WEN and Masonite – to dominate the market.

10.     Masonite abruptly exited the doorskins market in June 2014 shortly after the CMI Acquisition. This left JELD-WEN as the market's sole supplier of doorskins to Independent Door Manufacturers and afforded JELD-WEN the sole power to set prices.

11.     Exploiting the Company's enhanced market power following the CMI Acquisition, as well as Masonite's exit from the doorskins market, JELD-WEN and then-CEO Defendant Hachigian began to engage in anticompetitive conduct against the Independent Door Manufactures even though the Company had long-term agreements to supply doorskins to these same Independent Door Manufacturers. All the Independent Door Manufacturers were direct competitors of JELD-WEN in the market for interior molded doors, including JELD-WEN's largest doorskins customer and second largest doors competitor (after Masonite), Steves & Sons.

12.     In 2014, Defendant Hachigian directed the Company to breach its supply agreements with the Independent Door Manufacturers by, among other things, raising prices and, in turn, substantially lessening competition in the market for the sale of interior molded doors. By raising the price of doorskins, JELD-WEN was able to both increase its revenues from selling doorskins and lessen competition for selling interior molded doors by limiting its competitors' ability to manufacture those doors. These directions to increase prices came directly from the Company's CEO and CFO, positions that were held at various times during the Relevant Period by Defendants Hachigian, Beck, Michel, and Mallard, as described further below.

13.     The breach of the supply agreements ultimately gave rise to litigation by Steves & Sons alleging, *inter alia*, anticompetitive conduct that violated the Clayton Act. *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, No. 3:16-cv-545 (E.D. Va. June 29, 2016) (the "Steves & Sons Litigation").

14.     On October 5, 2018, the judge presiding over the Steves & Sons Litigation—Judge Robert E. Payne—issued a Memorandum Opinion containing previously undisclosed facts about JELD-WEN's anticompetitive conduct. Judge Payne's opinion, which surprised the market, detailed factual findings about JELD-WEN's anticompetitive behavior and ordered divestiture of JELD-WEN's doorskins manufacturing facility in Towanda (the "Divestiture Decision"). The Divestiture Decision caused a drop of approximately 5% in JELD-WEN's stock price on October 9, 2018.

15.     JELD-WEN's stock dropped even further on October 15, 2018 after it announced that it expected to incur $76.5 million in liability due to a verdict in the Steves & Sons Litigation (the "Liability Announcement"). JELD-WEN claimed that it was able to make the Liability Announcement at that time because the Divestiture Decision "now provided sufficient detail for the company to estimate future liabilities." That same day, JELD-WEN also revealed that its CFO, Defendant Mallard, would resign. The next day, JELD-WEN stock dropped by 19%.

16.     As detailed herein, and as alleged in the recently settled federal securities class action in the District of Virginia styled *In Re: JELD-WEN Holding, Inc. Securities Litigation*, Case No. 3:20-cv-00112-JAG (the "Federal Securities Class Action"), JELD-WEN's officers and directors substantially damaged the Company by omitting material adverse facts from the Company's SEC filings.

17.     On October 26, 2020, the court denied defendants' motion to dismiss in the Federal Securities Class Action (Dkt. 103). In so ruling, Judge John A. Gibney, Jr. found that plaintiff adequately alleged material misrepresentations or omissions stemming from defendants' failure to disclose the Company's anti-competitive behavior to the market while at the same time publicly

touting its purported lawful pricing strategies to explain its success in a highly competitive marketplace. When discussing its pricing strategy, Judge Gibney found that the Company had a concomitant duty to tell the entire truth, including information concerning its anticompetitive behavior. *See id.* at 5-7. With respect to whether plaintiff alleged scienter, Judge Gibney ruled that allegations that defendants perpetrated an intentional, long-running, anticompetitive conspiracy demonstrated a malicious inference at least as strong as any innocent inference that the defense asked the court to draw. Judge Gibney also found that, "given Judge Payne's factual findings in the Divesture Decision, the malicious inference appears much stronger than the innocent inference." *Id* at 13.[1]

18.     In addition to causing the Company to engage in a long-running, anticompetitive conspiracy, the Individual Defendants caused the Company to file with the SEC two Form DEF14As, the first on March 16, 2018 and the second on March 25, 2019, which solicited votes to elect certain individuals to the Board. These proxies, however, were false and misleading because they falsely assured investors that the Company had complied with its Code of Business Conduct and its Audit Committee Charter during the preceding fiscal years.

19.     As demonstrated herein, the Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact concerning the Company's anticompetitive conduct. The Individual Defendants also willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

## JURISDICTION AND VENUE

---

[1] On April 21, 2021, the parties in the Federal Securities Class Action notified the Court that they had reached a preliminary settlement. *See* Federal Securities Class Action, Dkt. 266.

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise federal questions under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1).  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

22.     This Court has personal jurisdiction over each of the Defendants because each Defendant has minimum contacts with this District to justify the exercise of jurisdiction over them.

23.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because JELD-WEN is incorporated in this District. In addition, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## THE PARTIES

### Plaintiff

24.     Plaintiff Jason Aldridge is and has continuously been a stockholder of JELD-WEN during the wrongdoing complained of herein.

### Nominal Defendant

25.     Nominal Defendant JELD-WEN is a Delaware corporation with its principal executive offices at 2645 Silver Crescent Drive, Charlotte, North Carolina 28273. JELD-WEN's shares trade on the NYSE under the ticker symbol "JELD."

### Individual Defendants

26.    Defendant Mark A. Beck ("Beck") served as JELD-WEN's President and CEO from November 2015 until February 27, 2018. He also served as a member of the Company's Board from May 2016 until February 27, 2018.

27.    Defendant L. Brooks Mallard ("Mallard") served as Executive Vice President and CFO of JELD-WEN from November 2014 until November 8, 2018.

28.    Defendant Gary S. Michel ("Michel") has served as JELD-WEN's President and CEO, as well as a member of the Company's Board since June 2018.

29.    Defendant Kirk S. Hachigian ("Hachigian") served as President and CEO of the Company from March 2014 until November 2015, and later served as an interim CEO from February 27, 2018 until June of 2018. Defendant Hachigian also served as Executive Chairman of the Board from November 2015 until December 2016, and as Chairman from December 2016 until May 2019. For the fiscal years ended December 31, 2017 and December 31, 2018, Defendant Hachigian received $300,000 and $10,984,586 in total compensation, respectively. Defendant Hachigian's enormous jump in compensation during the Relevant Period was awarded while he was honored as having contributed to the Company's alleged financial successes, all the while playing a key part in the unlawful anticompetitive conduct outlined herein and making false statements as to that conduct and the actual source of the Company's revenues.

30.    Defendant Matthew Ross ("Ross") has served as a Company director since October 2011. For the fiscal years ended December 31, 2017 and December 31, 2018, Defendant Ross received $200,000 in total compensation each year.

31.    Defendant William Banholzer ("Banholzer") has served as a Company director since August 2017. For the fiscal years ended December 31, 2017 and December 31, 2018,

Defendant Banholzer received $111,000 and $200,000 in total compensation from the Company, respectively.

32.     Defendant Martha Byorum ("Byorum") has served as a Company director since July 2014. For the fiscal years ended December 31, 2017 and December 31, 2018, Defendant Byorum received $200,000 and $211,250 in total compensation from the Company, respectively.

33.     Defendant Gregory Maxwell ("Maxwell") has served as a Company director since February 2017. For the fiscal years ended December 31, 2017 and December 31, 2018, Defendant Maxwell received $225,000 in total compensation from the Company each year.

34.     Defendant Anthony Munk ("Munk") has served as a Company director since October 2011. For the fiscal years ended December 31, 2017 and December 31, 2018, Defendant Munk received $200,000 in total compensation from the Company each year.

35.     Defendant Suzanne Stefany ("Stefany") has served as a Company director since August 2017. For the fiscal years ended December 31, 2017 and December 31, 2018, Defendant Stefany received $66,500 and $200,000 in total compensation from the Company, respectively.

36.     Defendant Bruce Taten ("Taten") has served as a Company director since April 2014. For the fiscal years ended December 31, 2017 and December 31, 2018, Defendant Taten received $200,000 and $213,500 in total compensation from the Company, respectively.

37.     Defendant Roderick Wendt ("Wendt") has served as Vice Chairman since January 2014 and as a director since June 1985. For the fiscal years ended December 31, 2017 and December 31, 2018, Defendant Wendt received $208,000 in total compensation from the Company each year.

38.     Defendant Steven Wynne ("Wynne") has served as a Company director since March 2012. For the fiscal years ended December 31, 2017 and December 31, 2018, Defendant Wynne received $200,000 in total compensation from the Company each year.

39.     Defendant Patrick Tolbert ("Tolbert") served as a Company director during the Relevant Period and did not stand for reelection at the 2018 annual meeting. For the fiscal year ended December 31, 2017 and December 31, 2018, Defendant Tolbert received $200,000 and $45,000 in total compensation from the Company, respectively.

40.     Collectively, Defendants Beck, Mallard, Michel, Hachigian, Ross, Banholzer, Byorum, Maxwell, Munk, Stefany, Taten, Wendt, Wynne, and Tolbert, are referred to herein as the "Individual Defendants."

41.     Collectively, Defendants Maxwell, Byorum, Stefany, and Wynne are referred to herein as the "Audit Committee Defendants."

42.     The Individual Defendants, because of their positions with JELD-WEN, possessed the power and authority to control the contents of JELD-WEN's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants had access to copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and/or misleading.

## SUBSTANTIVE ALLEGATIONS

43.     JELD-WEN is a Delaware corporation that operates more than 100 manufacturing facilities internationally. JELD-WEN designs, produces, and distributes interior and exterior doors; wood, vinyl, and aluminum windows; wall systems, shower enclosures, closet systems, and other mill goods.

44.     As of December 31, 2020, the Company's door sales accounted for 65% of its net revenues.

45.     The interior molded door is the most popular type of interior door in North America. It simulates the aesthetics of a solid wood door but may be manufactured and sold at a significantly lower price because it is made by sandwiching a wood frame and a hollow or solid core between two doorskins.

46.     Doorskins are the principal component of interior molded doors, accounting for up to 70% of the cost to manufacture a molded door.

47.     JELD-WEN began manufacturing interior molded doorskins in the early 1970s. Since that time, it has owned and operated nine doorskin manufacturing plants, six of which the Company built itself.

48.     Until the 1990s, JELD-WEN supplied doorskins to domestic manufacturers of interior molded doors but did not itself manufacture completed interior molded doors. In the 1990s, however, JELD-WEN began to manufacture and sell interior molded doors, as well as doorskins for those doors, making JELD-WEN a "vertically integrated" manufacturer. Shortly thereafter, JELD-WEN began to buy up smaller manufacturers of interior molded doors, including Michigan Birch Door and its Doorcraft division, an interior molded door manufacturing plant from Young Door, and Morgan Door Co.

49.     Until 2014, the only other major manufacturer of doorskins was Masonite, which was wholly owned by International Paper. Unlike JELD-WEN, Masonite did not sell completed interior molded doors, but rather manufactured doorskins to sell to independent, non-vertically integrated interior molded door manufacturers.

50.     As a result, Masonite and JELD-WEN dominated the doorskins market in the 2000s. Those two companies, along with Fibramold,[2] a Chilean joint venture, were the only firms with significant sales of doorskins in the United States at that time. A few other manufacturers each sold less than one percent of the doorskins purchased in the United States.

**The DOJ Intervenes as the Industry Seeks to Consolidate**

51.     In the early 2000s, the largest manufacturer of interior molded doors was Premdor, Inc. ("Premdor"), which controlled more than 40% of the market. Like JELD-WEN, Premdor was a vertically integrated interior molded door manufacturer that, according to the DOJ, was a "small, but significant" competitor in the doorskins market.

52.     On September 30, 2000, International Paper announced its intention to sell Masonite to Premdor. At the time, Masonite owned two doorskins plants in the United States, one in Towanda, Pennsylvania and another in Laurel, Mississippi.

53.     On August 3, 2001, the DOJ filed a civil antitrust action seeking to block the merger, alleging that Premdor's acquisition of Masonite and its related assets would violate Section 7 of the Clayton Act. *See United States v. Premdor, et al.*, No. 1:01-CV-01696 (D.D.C.).

54.     The same day it filed suit, the United States filed a proposed final judgment that would permit the acquisition to take place, but only if the Towanda doorskin plant was divested from Masonite and spun off to a buyer acceptable to the United States. Following the required

---

[2] In 2000, Fibramold accounted for less than 10% of the doorskins used for the manufacture of interior molded doors in the United States.

public comment period, the judgment, including the divestiture provision, became final. It was entered by the court on April 5, 2002. Following this conditional approval, Premdor acquired Masonite and, going forward, operated the combined businesses under the name "Masonite."

55.     This divestiture resulted in the creation of CMI as a stand-alone competitor. On March 29, 2002, CMI purchased the Towanda doorskins plant and became a third major competitor in the doorskins market, selling doorskins to independent interior molded door manufacturers in competition with JELD-WEN and Masonite. The divestiture was intended to allow CMI to manufacture and sell all the designs and sizes of interior molded doorskins that Masonite had sold at that time, with the stated aim of maintaining competition in the domestic interior molded door market.

56.     Following the acquisition of Masonite by Premdor, consolidation in the interior molded door and doorskins markets continued. JELD-WEN, Masonite, and CMI each acquired smaller interior molded door manufacturers, further eroding competition. For example, CMI acquired C&S Door in 2005, making it another vertically integrated doorskins and interior molded door company (in addition to Masonite and JELD-WEN).

57.     This industry consolidation resulted in JELD-WEN and Masonite controlling a commanding share of the market for interior molded doors—40% and 42%, respectively—with CMI and Steves & Sons controlling 7% each. The remainder of the market was controlled by a few small, regional interior molded door manufacturers. Notably, while JELD-WEN, Masonite and CMI were all vertically integrated companies that produced both doorskins and completed interior molded doors, Steves & Sons only produced completed doors, meaning it had to purchase its doorskins from one of its direct competitors.

**JELD-WEN Enters into Long-Term Supply Agreements
with Independent Door Manufacturers**

58.     Years later, in 2012, JELD-WEN sought to purchase CMI, including the Towanda

doorskins factory at issue in the Premdor-Masonite acquisition. The Company knew, however,

that the acquisition of CMI, like the Premdor-Masonite merger, would implicate antitrust concerns.

To ameliorate concerns from Independent Door Manufacturers that JELD-WEN would exploit its

market power over the supply of doorskins, and as part of the Company's plan to appease the DOJ,

JELD-WEN began to enter into supply agreements with Independent Door Manufacturers for the

sale of doorskins. The purpose of the supply agreements was to assure the DOJ that JELD-WEN

would continue to sell doorskins at competitive prices to competing interior molded door

manufacturers and that, therefore, competition in the door market would not be diminished by the

Company's acquisition of CMI.

59.     On May 1, 2012, JELD-WEN entered into a long-term supply agreement with its

largest doorskins customer, Steves & Sons (the "Supply Agreement"), for a substantial percentage

of its doorskin purchases.

60.     That Supply Agreement was to be in effect through December 31, 2019, with

automatic renewals of seven-year terms unless either party terminated the contract. The contract

could be terminated by Steves & Sons for any reason upon two-year written notice delivered to

JELD-WEN, or by JELD-WEN upon seven-year written notice delivered to Steves & Sons.

61.     The doorskin prices that JELD-WEN could charge Steves & Sons under the Supply

Agreement varied according to a contractually defined formula based on JELD-WEN's key input

costs, which included raw material or energy costs. The Supply Agreement obligated JELD-WEN

to give Steves & Sons annual notice of the prices and input costs for the coming year by November

30. If JELD-WEN failed to provide this notice, it could not impose any price increases.

**JELD-WEN's Acquisition of CMI**

62.    On or about June 15, 2012, six weeks after executing the Supply Agreement, JELD-WEN publicly announced its intent to merge with and acquire CMI, the completion of which was contingent upon DOJ approval. Executives from both companies had been involved in Premdor's acquisition of Masonite and the divestiture of the Towanda facility in 2001 and 2002 and were therefore aware of the problems that the DOJ review could pose. Nevertheless, early in 2012, JELD-WEN and CMI decided to request that the DOJ approve the transaction.

63.    Because of its knowledge of this likely DOJ hurdle, however, JELD-WEN intentionally approached the DOJ only *after* it had entered the long-term supply contracts with the Independent Door Manufacturers. Indeed, as Judge Payne later noted, JELD-WEN engaged in this "oft-used tactic" in order to "assuage the concerns of the DOJ and the [Independent Door Manufacturers] about [the] anticompetitive effects of the proposed [CMI Acquisition]."

64.    This tactic limited the DOJ's ability to secure evidence necessary to block the merger for the simple reason that customers with supply agreements are more willing to accept a merger proposed by their supplier, because they do not have reason to feel threatened.

65.    In fact, as Judge Payne later explained, according to JELD-WEN's internal documents, the Company considered it a "tactical error to even call [the DOJ]" before entering into those supply agreements, as JELD-WEN was fully aware that having those contracts in place would "be very positive for us [at the DOJ] if we ever go." Further demonstrating its knowledge that, in the absence of cautionary measures, the CMI Acquisition would implicate serious antitrust concerns, JELD-WEN retained highly qualified antitrust counsel in connection with its request for DOJ approval.

66.     After JELD-WEN approached the DOJ, the agency's Antitrust Division notified JELD-WEN that it had opened a preliminary investigation into the proposed CMI Acquisition. Representatives of CMI and JELD-WEN then gave presentations to the DOJ about the acquisition. The presentations emphasized that JELD-WEN had entered long-term supply contracts with the Independent Door Manufacturers.

67.     As admitted by James Morrison, former Executive Vice President and Chief Operating Officer of JELD-WEN, the purpose of entering the contracts was "to alleviate" customer concerns about not having a supply and "to assure the customers of CMI, who might eventually become customers of JELD-WEN, that JELD-WEN was committed to their continued supply."

68.     At around the same time, the DOJ began to contact the external door manufacturers with which JELD-WEN had long-term supply agreements to determine whether they had concerns with JELD-WEN purchasing CMI and the doorskins plant.

69.     When Steves & Sons, JELD-WEN's largest doorskins customer, was contacted about the proposed acquisition, it informed the DOJ that it did not oppose the acquisition because it believed that the Supply Agreement would prevent JELD-WEN from taking any anticompetitive actions. According to the complaint ultimately filed in the Steves & Sons Litigation, the other smaller Independent Door Manufacturers with which JELD-WEN had supply agreements also did not object to the Acquisition.

70.     The DOJ subsequently closed its investigation on September 28, 2012, and the CMI Acquisition closed on October 24, 2012.

71.     After the Acquisition closed, JELD-WEN and Masonite became the ***only two*** manufacturers of doorskins in the United States and controlled 85% of the market for interior molded doors. Compounding that market dominance, the manufacturers comprising the other 15%

of the interior molded door market (among them Steves & Sons) were not vertically integrated and had no choice but to purchase doorskins from either JELD-WEN or Masonite.

72.     The competitive landscape that emerged in the wake of the CMI Acquisition consisted of just two dominant, vertically integrated door manufacturers. Each had incentives to collude, which is exactly what the DOJ had warned of when it required Premdor to divest the assets represented by CMI in the first place.

**JELD-WEN's Anticompetitive Conduct Begins**

73.     Prior to its acquisition of CMI, JELD-WEN aggressively competed with Masonite for the sale of doorskins to other interior molded door manufacturers. Following the CMI Acquisition, which resulted in even greater market dominance by the Company, JELD-WEN drove up the price of interior molded doors through anticompetitive conduct.

74.     In late 2012, JELD-WEN and Masonite began imposing uniform price increases on interior molded doors. JELD-WEN and Masonite's steady, lock-step price increases were not the result of competitive market forces, such as cost or demand factors. The largest input cost of interior molded doors is doorskins. Since JELD-WEN and Masonite are vertically integrated, they control those costs, and their price increases outpaced any increase in their raw material and other costs.

75.     In early 2014, with the market for interior molded doorskins limited to JELD- WEN and Masonite, JELD-WEN announced a new pricing strategy. This new strategy was a departure from its old, high volume/low margin strategy, which emphasized growth and increased market share. The prior strategy often resulted in competitive pricing.  The Company's new lower volume/higher margin strategy instead emphasized "pricing optimization," to increase product profitability on a per unit basis.

76.     In June 2014, Masonite abruptly stopped selling doorskins to other door manufacturers. Masonite announced this decision during a presentation to its investors on June 25, 2014, where it explained that "[o]nly Masonite and JELD-WEN service the entire North American market" but, with Masonite having determined not to sell doorskins to its competitors, "that only leaves one other outlet for them to get their [doorskins] from in North America." Masonite's departure from the doorskin industry made JELD-WEN the market's **sole supplier** of doorskins to Independent Door Manufacturers.

77.     JELD-WEN soon began exploiting its market dominance now that Independent Door Manufacturers had no other place to turn for doorskins. It did this by extra-contractually raising the prices it charged Independent Door Manufacturers.  These unilateral price increases violated the long-term supply agreements' terms.

78.     JELD-WEN ultimately breached the Supply Agreement with Steves & Sons, its largest doorskins customer, by improperly increasing the prices that it charged Steves & Sons to purchase doorskins.

79.     The Supply Agreement prohibited price increases unless they were tied to the rise in certain pre-specified cost inputs.

80.     JELD-WEN, however, did not experience increased costs to justify the price increases.  In fact, following the CMI Acquisition, JELD-WEN's key input costs **declined** every year, negating the only defensible justification for price increases under the Supply Agreement.

81.     JELD-WEN charged even higher supra-competitive prices to other Independent Door Manufacturers with which the Company did not have any supply agreements.

82.     These pricing decisions were a consequence of JELD-WEN's enhanced market power following the CMI Acquisition. By using its market dominance to raise the price of

doorskins, JELD-WEN was able to both artificially increase its revenues for sale of those doorskins and improperly lessen competition in the market for sale of interior molded doors by limiting Steves & Sons' ability to manufacture them.

83.     Moreover, JELD-WEN attempted to add a "capital charge" to the normal doorskin prices under the Supply Agreement. The Supply Agreement's contractual pricing provisions did not allow this. Although Steves & Sons rejected this charge, as Judge Payne later found, JELD-WEN was successful in extracting new contracts from other Independent Door Manufacturers, requiring them to pay this charge under threat of either termination of the supply contracts or loss of doorskin supply. By this time, JELD-WEN was the only supplier of doorskins to Independent Door Manufacturers in the United States, making its threats particularly effective.

84.     In 2014, JELD-WEN changed how it dealt with defective doorskins by significantly limiting reimbursements under the Supply Agreement. Indeed, in late 2014 or early 2015, JELD-WEN adopted a policy only to reimburse Steves & Sons for the defective doorskins, rather than for the full cost of the doors. JELD-WEN decided to limit reimbursements because it was no longer competitively necessary to extend this benefit to Steves & Sons given the substantially lessened competition in the market.

85.     In 2015, Steves & Sons requested that the DOJ reexamine JELD-WEN's anticompetitive conduct. Steves & Sons first made a presentation to the DOJ in December 2015, and then produced documents a month later, in response to a civil investigation demand. On April 7, 2016, JELD-WEN also made a presentation to the DOJ, and in May 2016, the DOJ closed its investigation without taking any action.

86.     Thereafter, on June 29, 2016, Steves & Sons filed the Steves & Sons Litigation alleging that the Company's acquisition of CMI and JELD-WEN's subsequent price increases and

practices violated federal antitrust laws, specifically, Section 7 of the Clayton Act, 15 U.S.C. § 18, which prohibits, in relevant part, mergers and acquisitions where the effect may be to substantially lessen competition.

## The Individual Defendants' False and Misleading Statements

87.     Throughout the Relevant Period, Individual Defendants made a series of misrepresentations concerning the source of their revenues and the existence of competition in the market for interior molded doors, regularly touting that the source of JELD-WEN's financial success was legitimate and lawful business strategies. Meanwhile, the Individual Defendants intentionally omitted crucial details about the Company's anticompetitive conduct, which was stifling competition and artificially propping up JELD-WEN's revenues.

88.     Specifically, the Individual Defendants stated that the Company's success was driven by its strategic pricing practices. In fact, as outlined further below, the Company's success during the Relevant Period was largely a result of the Company exploiting its market power by engaging in anticompetitive conduct against other Independent Door Manufacturers. Rendering matters even worse, the Company was extra-contractually raising prices in direct breach of the long-term supply agreements for doorskins into which it had entered with its customers.

### *January 26, 2017 – IPO Offering Materials Form 424B*

89.     The Relevant Period begins on January 26, 2017, when the SEC declared JELD-WEN's registration statement for its initial public offering (the "IPO Registration Statement") effective. On or about January 27, 2017, JELD-WEN conducted an IPO pursuant to the IPO Registration Statement. On January 30, 2017, JELD-WEN filed a prospectus for the IPO with the SEC on Form 424B4, which incorporated and formed part of the IPO Registration Statement (together with the IPO Registration Statement, the "IPO Offering Materials").

90.    Pursuant to the IPO Offering Materials, the Individual Defendants represented that

JELD-WEN "operate[s] in a highly competitive business environment," noting that "[t]he door and

window industry is highly competitive and includes a number of regional and international

competitors. Competition is largely based on the functional and aesthetic quality of products,

service quality, distribution capability and price." The IPO Offering Materials also described

Masonite as among the Company's "major competitors" in the North American interior doors

business.

91.    The IPO Offering Materials further stated that "[w]hile we operate in a competitive

market, pricing discipline is an important element of our strategy to achieve profitable growth

through improved margins."

92.    With regard to pricing, the IPO Offering Materials described JELD-WEN's

business strategy as follows:

> **Pricing Optimization**: We are focused on profitable growth and will
> continue to employ a strategic approach to pricing our products. Pricing
> discipline is an important element of our effort to improve our profit
> margins and earn an appropriate return on our invested capital. Over the
> past two years we have realized meaningful pricing gains by increasing our
> focus on customer- and product-level profitability in order to improve the
> profitability of certain underperforming lines of business. In addition, we
> have changed our historical approach in certain cases from pricing products
> based on contribution margin targets to an approach of pricing products
> based on fully loaded cost, which includes the capital we have invested in
> our manufacturing capacity, research and development capabilities, and
> brand equity.

93.    The Individual Defendants attributed increases in net revenues, in part, to "an

increase in pricing as a result of implementing our pricing optimization strategy."

94.    The Company further touted its "continued pricing optimization" as a strategic

initiative "to deliver profitable organic revenue growth," stating that JELD-WEN "will continue

to employ a strategic approach to pricing our products." The phrase "continued pricing

optimization" was misleading, as it was intended to assure investors that the Company was lawfully optimizing its price point for its products when it actually was engaging in unlawful anticompetitive practices.

95.     For example, the IPO Offering Materials represented that, in early 2014, the Company changed its pricing strategy and that, as a result, "operations during 2014 and 2015 benefitted from improved pricing, particularly in North America." However, unbeknownst to investors, around that same time Defendant Hachigian was directing the Company to break its long-term supply agreements by implementing extra-contractual price increases.

96.     Analysts reacted favorably to the Individual Defendants' positive statements regarding the Company's financial success in a highly competitive market. For example, on February 2, 2017, an analyst from Wedbush reported that the JELD-WEN team, led by Defendant Beck, "is making transformation change through the use of a proven track record including improved pricing discipline, establishment of operational excellence (productivity tracking metrics), investment in building growth infrastructure and inorganic strategic growth."

***February 22, 2017 – 4Q 2016 Earnings Call and Investor Presentation***

97.     On February 22, 2017, JELD-WEN held an earnings call discussing the Company's fourth quarter and full year 2016 financial results. During that call, Defendant Mallard attributed those results, including specifically the Company's increase in adjusted EBITDA and EBITDA margins, to legitimate and lawful strategies including "favorable pricing, improved cost productivity, and the favorable impact of recent acquisitions." Defendant Mallard went on to say that the improvement in JELD-WEN's revenues "was driven by a 5% core growth comprised of a 2% benefit from our pricing optimization strategy in all three segments[.]"

98.     In connection with the above earnings call, the Individual Defendants released a presentation for investors in which JELD-WEN further emphasized its "Balanced Approach to

Margin Expansion" and its "World-Class Performance and Returns," highlighting several drivers of its revenue growth and margin expansion. Among those drivers, the Company listed "Profitable Organic Growth" from, *inter alia*, "Strategic Pricing" and "Pricing Optimization." This presentation also noted that the Company's acquisitions drove top line growth and were part of a plan for increasing revenue growth but omitted to state that such conduct would expose the Company to risks of liability associated with unlawful, anticompetitive practices.

99.    Defendant Beck elaborated on the February 22, 2017 earnings call by touting the Company's "number one position by net revenues in the majority of countries and markets we serve." He attributed the Company's leading market position to "offering well-designed, high-quality products through strong and valued brands, and by reaching consumers through multiple channels."

100.    Once again, analysts credited the statements that the Individual Defendants made in the February 22, 2017 earnings call and investor presentation. For example, on February 22, 2017, Wells Fargo reported that the Company's success over the "[p]ast couple years [was] driven by pricing strategies," including "[f]avorable [p]ricing." On February 24, 2017, Bank of America stated "[r]egarding pricing, JELD recently established a pricing analytics group and is focusing its pricing strategy on driving return on invested capital[.]"

***March 3, 2017 – 2016 Form 10-K***

101.    On March 3, 2017, the Individual Defendants caused the Company to file a Form 10-K with the SEC for the year ended December 31, 2016 (the "2016 10-K"), which was signed by Defendants Beck, Mallard and Hachigian.

102.    The 2016 10-K stated, in part:

> The **door and window industry is highly competitive** and includes a number of regional and international competitors. Competition is largely based on the functional and aesthetic quality of products, service quality,

23

distribution capability and price. We believe that we are well-positioned in our industry due to our leading brands, our broad product lines, our consistently high product quality and service, our global manufacturing and distribution capabilities, and our extensive multi-channel distribution. For North American interior doors, **our major competitors include Masonite and several smaller independent door manufacturers**. For North American exterior doors, competitors include Masonite, Therma-Tru (a division of Fortune Brands), and Plastpro. The North American window market is highly fragmented, with sizable competitors including Anderson, Pella, Marvin, Ply-Gem, and Milgard (a division of Masco).

\*\*\*

**We operate in a highly competitive business environment**. Some of our competitors may have greater financial, marketing, and distribution resources and may develop stronger relationships with customers in the markets where we sell our products.

\*\*\*

While we operate in a competitive market, pricing discipline is an important element of our strategy to achieve profitable growth through improved margins.  Our strategies also include incentivizing our channel partners to sell our higher margin products and a renewed focus on innovation and the development of new technologies, which we believe will increase our sales volumes and the overall profitability of our product mix.

\*\*\*

In early 2014, our new management team began to strategically change our pricing strategy in several key areas. First, we focused on **making strategic pricing decisions based on analysis of customer and product level profitability** to restore profitability to underperforming lines of business. Second, **we increased our emphasis on pricing optimization**.[3]

103.    Analysts continued to react favorably to Defendants' statements regarding the source of JELD-WEN's success.  Wedbush noted on March 31, 2017 that "[w]e expect JELD-WEN Holdings to continue to benefit from the transformation under CEO Mark Beck including improved pricing discipline in 2015/2016[.]" The Individual Defendants' misleading statements outlined above regarding "price discipline" were being fed to the market, while the Individual

---

[3] Unless noted otherwise, all emphasis to quotations in this complaint has been added.

Defendants omitted that favorable revenues were not coming from "price discipline" but rather the Company's extensive and unlawful anticompetitive practices.

***May 9, 2017 – Form 8-K, 1Q 2017 Earnings Call and Investor Presentation***

104.     On May 9, 2017, the Individual Defendants caused the Company to file a Form 8-K with the SEC. The Form 8-K stated that "[t]he company defines core growth as the increase in net revenues, excluding the impact of foreign exchange and acquisitions completed in the last twelve months." The Form 8-K further stated that "[c]ore growth increased primarily as a result of increased shipping days in the quarter and positive pricing," which caused an "increase in gross margin."

105.     That same day, JELD-WEN held an earnings call discussing the Company's first quarter 2017 financial results. During that call, Defendant Mallard attributed those results, including specifically the Company's increase in adjusted EBITDA, to legitimate and lawful strategies, including "favorable pricing" and "profitable growth," among others.

106.     In response to an analyst's question about pricing, Defendant Beck stated during the call that, "if you go back for the last couple of years, we were doing larger than market price increases as we were playing catch up and trying to reset pricing where we thought they should be."

107.     In connection with the May 9, 2017 earnings call, the Individual Defendants released a presentation that emphasized the Company's "Balanced Approach to Margin Expansion" and its "World-Class Performance and Returns," highlighting several drivers of revenue growth and margin expansion including "Profitable Organic Growth" from, among other things, "Strategic Pricing" and "Pricing Optimization."

108.     On the May 9, 2017 earnings call, Defendant Beck again touted JELD-WEN's "number one position by net revenues in the majority of countries and markets we serve" and

attributed the Company's leading market position to "offering well-designed, high quality products and by reaching consumers through multiple channels."

109.    Analysts reacted positively to the May 9, 2017 Form 8-K, earnings call, and investor presentation. For example, on May 10, 2017, J.P. Morgan reported that "adjusted EBIDTA margins were above our estimate, we believe mostly driven by better price." Barclays echoed these sentiments, stating that "we are encouraged by the $5 mn increase to FY EBITDA guidance and think this could still reflect some conservatism given the continued progress on cost and productivity initiatives and potential for additional pricing to cover material cost inflation. We continue to view JELD as one of our most compelling ideas given its unique 'self-help' margin opportunity over the next several years."

***May 12, 2017 – 1Q 2017 Form 10-Q***

110.    On May 12, 2017, Defendants filed JELD-WEN's quarterly report for the quarter ended April 1, 2017 ("1Q 2017 10-Q"), which was signed by Defendant Mallard.

111.    The 1Q 2017 10-Q stated, in relevant part, with respect to the Steves and Sons Litigation:

> *Steves and Sons, Inc. vs JELD-WEN* – We sell molded door skins to certain customers pursuant to long-term contracts, and these customers in turn use the molded door skins to manufacture interior doors and compete directly against us in the marketplace. We have given notice of termination of one of these contracts and, on June 29, 2016, the counterparty to the contract, Steves filed a claim against JWI in the U.S. District Court for the Eastern District of Virginia, Richmond Division. The complaint alleges that our acquisition of CMI, together with subsequent price increases and termination of the contract, violated antitrust laws and constituted a breach of contract, breach of warranty, and tort. The complaint seeks injunctive relief, ordinary and treble damages, and declaratory relief. **We believe Steves' claims lack merit and intend to defend against this action vigorously**.

112.    The 1Q 2017 10-Q also stated that JELD-WEN operates in a "highly competitive business environment" and "[t]he increase in pricing was the result of implementing our pricing optimization strategy."

**May 24, 2017 – First SPO Offering Materials**

113.    On or around May 24, 2017, JELD-WEN conducted a secondary public common stock offering (the "First SPO") pursuant to a registration statement (the "First SPO Registration Statement"). On May 26, 2017, JELD-WEN filed a prospectus for the First SPO with the SEC on Form 424B, which incorporated and formed part of the First SPO Registration Statement (together with the First SPO Registration Statement, the "First SPO Offering Materials").

114.    The First SPO Offering Materials stated, in part:

> **Pricing Optimization**: We are focused on profitable growth and will continue to employ a strategic approach to pricing our products. Pricing discipline is an important element of our effort to improve our profit margins and earn an appropriate return on our invested capital. Over the past three years we have realized meaningful pricing gains by increasing our focus on customer- and product-level profitability in order to improve the profitability of certain underperforming lines of business. In addition, we have changed our historical approach in certain cases from pricing products based on contribution margin targets to an approach of pricing products based on fully loaded cost, which includes the capital we have invested in our manufacturing capacity, research and development capabilities, and brand equity.

> \*\*\*

> *We operate in a highly competitive business environment.*

> \*\*\*

> In early 2014, our new management team began to strategically change our pricing strategy in several key areas. First, we focused on making strategic pricing decisions based on analysis of customer and product level profitability to restore profitability to underperforming lines of business. Second, we increased our emphasis on pricing optimization.

\*\*\*

Our core net revenues increased 3%, comprised of an increase in pricing as a result of implementing our pricing optimization strategy and volume/mix.

\*\*\*

**The door and window industry is highly competitive** and includes a number of regional and international competitors. Competition is largely based on the functional and aesthetic quality of products, service quality, distribution capability and price. We believe that we are well-positioned in our industry due to our leading brands, our broad product lines, our consistently high product quality and service, our global manufacturing and distribution capabilities, and our extensive multi-channel distribution. For North American interior doors, our major competitors include Masonite and several smaller independent door manufacturers. **For North American exterior doors, competitors include Masonite, Therma-Tru (a division of Fortune Brands), and Plastpro**.

115.     Analysts credited the Individual Defendants' statements that the Company was operating in a competitive environment, with an analyst from Credit Suisse stating on June 22, 2017 that "[s]ince 2015, management has worked to drive greater pricing discipline across its North American business," facilitated by "[i]ts leading position and the competitive dynamics in residential interior doors."

**August 8, 2017 – 2Q 2017 Form 10-Q, 2Q Earnings Call, and 2Q 2017 Investor Presentation**

116.     On August 8, 2017, Defendants filed JELD-WEN's Report on Form 10-Q for the quarter ended July 1, 2017 ("2Q 2017 10-Q"), signed by Defendant Mallard. In discussing the Company's increase in gross margin and gross margin as a percentage of net revenues, Defendants stated that the increase "was due to favorable pricing, cost saving initiatives and the contribution from recent acquisitions."

117.     That same day, JELD-WEN held an earnings call to discuss second quarter 2017 financial results. Defendant Mallard attributed those results, including specifically the Company's increase in gross margin and adjusted EBITDA,  to legitimate and lawful strategies, including

"favorable pricing, operational cost savings, improved mix and the impact of our recent acquisitions." Defendant Mallard went on to state:

> [W]hen we look at our entire manufacturing network and the demand that's coming in, we look at all the levers and we figure out which one we think is going to pull the most profitability for us. And so I would say we'd probably been pulling more on the price lever in the first half of the year, as opposed to the volume lever...and then that's resulted in nice margin accretion.

118.    Defendant Beck again touted during the call JELD-WEN's "#1 position by net revenues in the majority of countries and markets we serve." He attributed the Company's leading market position to "offering well-designed, high-quality products."

119.    Defendants also released an investors' presentation during the call on August 8, 2017, which emphasized the Company's "World-Class Performance and Returns," highlighting several drivers of the Company's revenue growth and margin expansion including "Profitable Organic Growth" from "Pricing Optimization."

120.    Analysts again reacted positively to Individual Defendants' statements. For example, on August 8, 2017, Wells Fargo stated that "JELD's [m]argin expansion is truly the crux of this story, and on that front, the [C]ompany has performed admirably."

***November 7, 2017 – Press Release, 3Q 2017 Earnings Call and Investor Presentation***

121.    On November 7, 2017, JELD-WEN issued a press release announcing its financial results for the third quarter of 2017. The press release stated that in North America "[t]he core revenue growth was primarily due to favorable pricing."

122.    That same day, JELD-WEN held an earnings call discussing the Company's third quarter 2017 financial results and Defendant Beck reiterated the Company's position that "[w]e are delivering core revenue growth with positive pricing."

123.    Defendant Mallard attributed the Company's third quarter 2017 financial results, including specifically the Company's increase in gross margin and gross margin percentage, as

well as its increase in adjusted EBITDA and margin, to legitimate and lawful strategies, including "favorable pricing and operational cost savings."

124.    In connection with the November 7, 2017 earnings call, Defendants released an investors' presentation that further emphasized the Company's "World-Class Performance and Returns," highlighting several drivers for  revenue growth and margin expansion. Among those drivers, the Company listed "Profitable Organic Growth" from "Pricing Optimization."

***November 8, 2017 – 3Q 2017 Form 10-Q***

125.    On November 8, 2017, the Individual Defendants filed JELD-WEN's Report on Form 10-Q for the quarter ended September 30, 2017 ("3Q 2017 10-Q"), signed by Defendant Mallard. In discussing the Company's increase in gross margin and gross margin as a percentage of net revenues, as well as the Company's increase in adjusted EBITDA in North America, the Individual Defendants stated that the increase was "due to favorable pricing and cost-saving initiatives."

126.    Analysts reacted positively to the Individual Defendants' statements in the November 7, 2017 earnings call and the 3Q 2017 10-Q. For example, on November 7, 2017, Credit Suisse reported that "the continued execution of JELD-WEN's multi-year turnaround strategy— centered on the development of a lean manufacturing culture, the evolution of its product offerings, and leveraging its leading market positioning—will be reflected in results over time." And on November 8, 2017, an analyst from RBC Capital Markets further noted that "[s]olid revenue performance reflects positive price/volume trends augmented by acquired revenues."

***November 15, 2017 – Second SPO Offering Materials***

127.    In approximately November 2015, JELD-WEN conducted another secondary public (the "Second SPO"). JELD-WEN conducted the Second SPO pursuant to a registration statement (the "Second SPO Registration Statement"). On November 17, 2017, JELD-WEN filed

a prospectus for the Second SPO with the SEC on Form 424B4, which incorporated and formed part of the registration statement (together with the Second SPO Registration Statement, the "Second SPO Offering Materials").

128.   The Second SPO Offering Materials stated, in relevant part:

We operate in a highly competitive business environment.

\*\*\*

In early 2014, our new management team began to strategically change our pricing strategy in several key areas. First, we focused on making strategic pricing decisions based on analysis of customer and product level profitability to restore profitability to underperforming lines of business. Second, we increased our emphasis on pricing optimization. As a result, our operations during 2014 and 2015 benefited from improved pricing, particularly in North America, where pricing returned to close to pre-crisis levels in some product lines across some market channels.

\*\*\*

Our core net revenues increased 3%, comprised of an increase in pricing as a result of implementing our pricing optimization strategy and volume/mix.

**Pricing Optimization**: We are focused on profitable growth and will continue to employ a strategic approach to pricing our products. **Pricing discipline is an important element of our effort to improve our profit margins** and earn an appropriate return on our invested capital. Over the past three years we have realized meaningful pricing gains by increasing our focus on customer- and product-level profitability in order to improve the profitability of certain underperforming lines of business. In addition, we have changed our historical approach in certain cases from pricing products based on contribution margin targets to an approach of pricing products based on fully loaded cost, which includes the capital we have invested in our manufacturing capacity, research and development capabilities, and brand equity.

\*\*\*

**The door and window industry is highly competitive** and includes a number of regional and international competitors. Competition is largely based on the functional and aesthetic quality of products, service quality, distribution capability and price. We believe that we are well-positioned in our industry due to our leading brands, our broad product lines, our consistently high product quality and service, our global manufacturing and

distribution capabilities, and our extensive multi-channel distribution. **For North American interior doors, our major competitors include Masonite and several smaller independent door manufacturers**.

***February 15, 2018 – Press Release Announcing Steves & Sons Verdict***

129.    On February 15, 2018, JELD-WEN issued a press release in which it announced that a jury in the United States District Court for the Eastern District of Virginia, Richmond Division, had returned a verdict in the lawsuit filed by Steves & Sons finding JELD-WEN's wholly owned subsidiary, JELD-WEN Inc., liable for violation of Section 7 of the Clayton Act and breach of the parties' Supply Agreement. The press release further disclosed that the jury had awarded Steves & Sons damages of $176 million, including past damages and future lost profits.

130.    The Company downplayed the import and accuracy of the jury verdict, stating that:

> ***The Company continues to believe that the facts underlying this dispute do not establish either a violation of the antitrust laws or a breach of contract.*** The Company notes that both before and after the CMI acquisition, the Antitrust Division of the Department of Justice reviewed the transaction and did not challenge it. JELD-WEN believes that multiple pretrial and trial rulings were erroneous and improperly limited the Company's defenses, and that judgment in accordance with the verdict would be improper for several reasons under applicable law. JELD-WEN intends to vigorously oppose entry of an adverse judgment, and to appeal any adverse judgment that may be entered. Accordingly, ***the Company does not believe that the ultimate outcome of this matter will have a material impact on its ability to operate in the ordinary course of business***.

131.    The statements in the above press release were false and materially misled investors because the Individual Defendants failed to disclose that JELD-WEN was engaged in anticompetitive conduct in violation of the Clayton Act through its acquisition of CMI and subsequent conduct towards Independent Door Manufacturers and that, therefore, a final ruling against JELD-WEN was probable and would likely have a material impact on JELD-WEN's business.

***February 21, 2018 – 4Q 2017 Earnings Call***

132.     Despite the verdict in the Steves & Sons Litigation, the Individual Defendants continued to make material misrepresentations and omissions to the market.

133.     On February 21, 2018, JELD-WEN held an earnings call discussing the Company's fourth quarter and full year 2017 financial results. During that call, Defendant Beck addressed the jury verdict in the Steves & Sons Litigation, stating that "we continue to believe that the claims asserted in the litigation lack merit. I will note that the Department of Justice reviewed our acquisition of CMI twice and declined to take any action. Furthermore, we believe that we acted in good faith and in compliance with our contractual agreements." Defendant Beck further noted that, despite the verdict, "[a]t this time, we have not reserved for any judgment related to this matter, as we do not believe that a loss is probable and estimable for the reasons that we've just described."

134.     Analysts credited the Individual Defendants' statements made during the February 21, 2018 earnings call regarding the Steves & Sons Litigation. For example, RBC Capital Markets noted the next day that "JELD is confident that the [C]ompany has strong grounds to reverse any judgment on appeal and notes that the DOJ reviewed the CMI [A]cquisition twice. JELD does not believe that a loss is probable or estimable."

135.     Just days later, on February 28, 2018, the Company announced the resignation of Defendant Beck as President and CEO, and as a member of JELD-WEN's Board of Directors. The Individual Defendants did not disclose a reason for Defendant Beck's resignation. He was replaced by Defendant Hachigian as interim CEO.

***March 6, 2018 – 2017 Form 10-K***

136.     On March 6, 2018, Defendants filed with the SEC their Annual Report on Form 10-K for the year ended December 31, 2017 (the "2017 10-K"), which was signed by Defendants

Mallard, Hachigian, Wendt, Banholzer, Byorum, Maxwell, Ross, Stefany, Taten, Tolbert and Wynne. In discussing the competitive environment in which the Company purportedly operated, the Individual Defendants stated, "*[t]he door and window industry is highly competitive and includes a number of regional and international competitors*," with "*Masonite and several smaller independent door manufacturers*" among its "*major competitors*" in the North American interior door market. Defendants went on to state that "*[w]e operate in a highly competitive business environment*."

137.    The 2017 10-K also stated, in relevant part, the following with respect to pricing and competition:

> Pricing Optimization: We are focused on profitable growth and will continue to employ a strategic approach to pricing our products. **Pricing discipline is an important element of our effort to improve our profit margins** and earn an appropriate return on our invested capital.
>
> \*\*\*
>
> **The door and window industry is highly competitive** and includes a number of regional and international competitors. Competition is largely based on the functional and aesthetic quality of products, service quality, distribution capability and price. We believe that we are well-positioned in our industry due to our leading brands, our broad product lines, our consistently high product quality and service, our global manufacturing and distribution capabilities, and our extensive multi-channel distribution. For North American interior doors, our major competitors include Masonite and several smaller independent door manufacturers.
>
> \*\*\*
>
> **We operate in a highly competitive business environment**.
>
> \*\*\*
>
> In early 2014, our management team began to strategically change our pricing strategy in several key areas. First, we focused on making strategic pricing decisions based on analysis of customer and product level profitability to restore profitability to underperforming lines of business. Second, we increased our emphasis on pricing optimization. As a result, our

operations during 2014 and 2015 benefited from improved pricing, particularly in North America, where pricing returned to close to pre-crisis levels in some product lines across some market channels.

\*\*\*

**The increase in gross margin and gross margin percentage was due to favorable pricing**, cost savings initiatives and contribution from recent acquisitions, partially offset by operational inefficiencies in our North American windows business.

\*\*\*

Our core net revenues increased 3%, **comprised of an increase in pricing as a result of implementing our pricing optimization strategy** and volume/mix.

### *May 8, 2018 – 1Q 2018 Earnings Call*

138.    On May 8, 2018, JELD-WEN held an earnings call to review the Company's first quarter 2018 results. When discussing the trajectory and basis for the Company's growth, Defendant Hachigian stated, "I think the path from four [percent] to 12[%] [EBITDA margin] has been primarily getting rid of bad margin business, taking pricing actions to get us back to price points that were prerecession."

### *May 9, 2018 – 1Q 2018 Form 10-Q*

139.    On May 9, 2018, the Individual Defendants filed JELD-WEN's Report on Form 10-Q for the quarter ended March 31, 2018, which was signed by Defendant Mallard. It stated that the Company's increase in gross margin was "***due to favorable pricing***, cost-saving initiatives and contribution from recent acquisitions[.]"

### *August 7, 2018 – 2Q 2018 Form 10-Q and 2Q 2018 Earnings Call*

140.    On August 7, 2018, Defendants filed JELD-WEN's quarterly report on Form 10-Q for the quarter ended June 30, 2018, which was signed by Defendant Mallard. In discussing the

Company's increase in gross margin and net revenues in North America, the Individual Defendants stated that the increase was "***due to favorable pricing***," among other things.

141.    On that same day, JELD-WEN held an earnings call to review the Company's second quarter 2018 financial results. During that call, Defendant Michel attributed the Company's "strong revenue growth," in part, to legitimate and lawful strategies, including "***improved pricing in all 3 regions both compared to [the] prior year as well as sequentially compared to the first quarter***."

142.    On the same call, when asked about the Steves & Sons verdict, Defendant Michel reiterated that "***JELD-WEN believes that the jury verdict in this case is erroneous and that there are strong bases for any verdict entered as a final judgment to be overturned on appeal.***"

143.    Defendant Michel's statements during the call were materially false and misleading because the Company was engaged in anticompetitive conduct and the probability of the judgment being overturned was much smaller than what he suggested.

144.    The statements referenced above were further materially false and misleading because the Company's increased gross margins and net revenues were not due to "favorable pricing" or "pricing optimization," but to a carefully crafted scheme to acquire the Towanda manufacturing facility and become the only vertically integrated doorskin manufacturer in the United States. The long-term supply agreements were a ruse to trick the DOJ and Independent Door Manufacturers, like Steves & Sons, to allow the CMI Acquisition to take place so that JELD-WEN could solidify its market dominance. Although not disclosed to the market, the Company never had any intention of honoring its supply agreements. Finally, due to the anticompetitive scheme described herein, an unfavorable outcome in the Steves & Sons Litigation was probable. Nevertheless, throughout the Relevant Period, Individual Defendants continued to deny and

downplay the accuracy of the allegations and the likelihood of liability from the Steves & Sons

Litigation.

**October 5, 2018 – The Truth is Partially Revealed by Judge Payne's Decision**
**in the Steves & Sons Litigation**

145.    On October 5, 2018, the truth and foreseeable risks concealed by the Individual

Defendants' misconduct were partially revealed when Judge Payne released his findings of fact

following an evidentiary hearing on the issue of divestiture. Judge Payne specifically detailed

JELD-WEN's anticompetitive conduct, including, among other things, that JELD-WEN "decided

to approach the DOJ only after it had entered into long-term supply contracts with the [Independent

Door Manufacturers], knowing that this oft-used tactic would assuage the concerns of the DOJ and

the [Independent Door Manufacturers] about anticompetitive effects of the proposed merger."

146.    Judge Payne further discussed JELD-WEN's misconduct stating in part that:

> [I]t is necessary to remember that JELD-WEN **was aware at the time of
> the merger that the antitrust issues associated with the CMI
> Acquisition were significant.** Indeed, having calculated market
> concentration as a consequence of the forthcoming acquisition and the
> Herfindahl-Hirschman indices for markets impacted by the merger, JELD-
> WEN retained highly-qualified antitrust counsel from one of the nation's
> largest law firms, O'Melveny & Myers. In sum, and as the record shows,
> **JELD-WEN knew full well of the merger's antitrust implications.**
>
> Mindful of those implications, **JELD-WEN pursued an established
> merger strategy to assuage any possible concerns from the DOJ, from
> CMI's customers, and from JELD-WEN's own customers (including
> Steves)**. Specifically, JELD-WEN developed a plan to enter into long-term
> supplyagreements with [I]ndependent [D]oor [M]anufacturers in the United
> States. . . .
> As part of its strategy, **JELD-WEN deliberately decided not to approach
> the DOJ about the proposed CMI Acquisition until those long-term
> agreements had been entered.** In fact, JELD-WEN's internal documents
> show that the **[C]ompany considered it a "tactical error to even call [the
> DOJ]"** before entering into those supply agreements, and that JELD-
> WEN was fully aware that having those contracts in place would "be
> very positive for us [at the DOJ] if we ever go."

***

> And, when JELD-WEN did approach the DOJ about the CMI Acquisition, it emphasized its long-term supply agreements with Steves, Lynden, and others. And [James] Morrison, who led the [C]ompany's presentation to the DOJ, admitted that the purpose of entering into such contracts was **"to alleviate" customer concerns** about not having a supply and "to assure the customers of CMI, who might eventually become customers of JELD-WEN, that JELD-WEN was committed to their continued supply."

147.   Finally, Judge Payne ordered that the Company divest the Towanda, Pennsylvania doorskin facility it previously acquired in the CMI Acquisition.

148.   Judge Payne's decision shed additional light on the Individual Defendants' course of conduct that had been previously concealed and/or obscured from the market.  For example, the motivation behind the Company's acquisition of CMI became clear, as did its plan to enter into the long-term doorskin supply arrangements with Independent Door Manufacturers in order to secure DOJ approval for the CMI Acquisition.  It was also apparent that the Company intended to break those contracts at the earliest opportunity as part of its anticompetitive plan.

**October 6, 2018 – The Company Continues to Misrepresent its Anticompetitive Practices**

149.   On October 6, 2018, JELD-WEN issued a press release addressing Judge Payne's decision. In the press release, which was also filed with the SEC on Form 8-K on October 9, 2018, the Company stated that "***JELD-WEN firmly maintains that it has not violated any antitrust laws***," and that Judge Payne was "***incorrect due to multiple flawed rulings during the trial process***."

150.   The Company further reiterated that the DOJ "conducted two separate reviews of JELD-WEN's acquisition of CMI" and, "[o]n both occasions, the CMI [A]cquisition cleared DOJ review."

151.   Judge Payne's decision caused several securities analysts to lower their price targets on JELD-WEN stock with analysts at RBC Capital Markets noting on October 8, 2018 that up to

33% of JELD-WEN's global doorskin manufacturing capacity would be lost by the divestiture of the Towanda plant. Bank of America further commented on October 8, 2018 that the divestiture "could be the worst case scenario."

152.    The Company's stock price, however, remained artificially inflated even after this ruling because the Individual Defendants continued falsely to reassure the market that "JELD-WEN firmly maintains that it has not violated any antitrust laws." The Company further protested that the decision was "incorrect due to multiple flawed rulings during the trial process."

153.    The Individual Defendants' continued adherence to their false narrative reassured some securities analysts. For example, Bank of America reported on October 8, 2018, that "[i]t seems unlikely to us that a Clayton Act ruling would ultimately be rendered given the fact that the Department of Justice (DOJ) approved the CMI [A]cquisition, of which the Towanda facility was the most substantial asset, prior to its consummation in 2012."

154.    Nevertheless, the price of JELD-WEN common stock declined by $1.18 per share, or nearly 5%, to close at $22.91 on October 9, 2018.

**October 15, 2018 – The Full Truth Emerges**

155.    It was not until October 15, 2018 that the entirety and scope of the Individual Defendants' malfeasance was revealed to the markets. On that date, JELD-WEN belatedly acknowledged and admitted that the Company expected its third quarter 2018 financial results to include a $76.5 million charge related to the Steves & Sons Litigation, and reflected the judgment anticipated to be entered against JELD-WEN, as recent rulings in the case "now provided sufficient detail for the [C]ompany to estimate future liabilities." The Company simultaneously announced the resignation of its CFO, Defendant Mallard.

156.    The Company's position as to classification and exposure stemming from the Steves & Sons Litigation predictably caused JELD-WEN stock to decline by $4.03 per share, or

*19%*, to close at $17.28 on October 16, 2018.  Analysts were surprised by this revelation, with Gabelli noting on October 17, 2018 that "[i]n retrospect, we underestimated the challenges JELD faced in 2018 from litigation." RBC Capital Markets agreed, noting on November 7, 2018 that "[w]e think investor concerns regarding both the current management transitions and the unfavorable legal litigation with Steves & Sons are warranted."

**The False and Misleading Proxies**

157.    In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, certain Individual Defendants caused the Company to issue false and misleading proxy statements during the Relevant Period. Defendants Hachigian, Banholzer, Byorum, Maxwell, Munk, Ross, Stefany, Taten, Wendt, and Wynne approved the Form DEF14A filed with the SEC on March 16, 2018 (the "2018 Proxy"). Defendants Hachigian, Banholzer, Byorum, Maxwell, Michel, Munk, Ross, Stefany, Taten, Wendt, and Wynne approved the Form DEF14A filed with the SEC on March 25, 2109 (the "2019 Proxy" and, together with the 2018 Proxy, the "Proxies").[4]

158.    The 2018 Proxy sought stockholder votes to, among other things, elect Defendants Hachigian, Munk, and Wynne for a three-year term.

159.    In an attempt to secure these votes, the 2018 Proxy assured stockholders that the Board and its committees regularly assessed and managed the risks that JELD-WEN faced, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans. The 2018 Proxy first stated:

      **Risk Oversight**

---

[4] These proxy allegations are based solely on negligence; they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they do not allege fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the proxy allegations and related claims.

Our Board oversees management's enterprise-wide risk management function, both as a whole Board and through its committees. At least annually, the Board reviews strategic risks and opportunities facing the Company. Other important categories of risk are assigned to designated Board committees that report back to the full Board. In general, the committees oversee the following:

| Committee | Primary Area of Risk Oversight |
| --- | --- |
| Audit Committee | Risks related to major financial risk exposures, significant legal, regulatory and compliance issues, internal controls and the overall risk assessment and risk management function |
| Compensation Committee | Risks associated with compensation policies and practices, including incentive compensation, and succession planning |
| Governance and Nominating Committee | Risks related to corporate governance, effectiveness of Board and committee oversight and review of director candidates, conflicts of interest and director independence, as well as shareholder concerns |

The Audit Committee meets at least quarterly with our Chief Financial Officer and our independent auditor to receive regular updates regarding management's assessment of risk exposures including liquidity, credit, and operational risks and the process in place to monitor such risks and review results of operations, financial reporting, and assessments of internal controls over financial reporting.

The Compensation Committee meets at least quarterly to consider management's assessment of employee and compensation risks, monitor incentive and equity-based compensation plans, and, at least annually, review the Company's compensation programs to confirm they do not incentivize unnecessary or excessive risk taking.

The Governance and Nominating Committee meets quarterly to oversee risks related to overall corporate governance, including board and committee composition, director candidates and independence matters, and  actively engages in overseeing risks associated with succession planning for the Board and senior management.

Our Board believes that the division of risk management responsibilities described above is an effective approach for addressing the risks facing the Company and that our Board leadership structure supports this approach.

160. Second, the 2018 Proxy stated:

**REPORT OF THE AUDIT COMMITTEE OF THE BOARD**

The Audit Committee operates under a written charter adopted by the Board. The charter is available on the Company's website at *investors.jeld-wen.com/corporate-governance/governance-documents*.

The Audit Committee is responsible for the oversight of the integrity of the Company's consolidated financial statements, the Company's system of internal controls over financial reporting, financial risk management, the qualifications and independence of the Company's independent auditor, the performance of the Company's internal auditors and independent auditor, and the Company's compliance with legal and regulatory requirements. Subject to ratification by the shareholders, the Audit Committee has the sole authority and responsibility to select, determine the compensation of, oversee, evaluate and, when appropriate, replace the Company's independent auditor.

The Audit Committee serves in an oversight capacity and is not part of the Company's managerial or operational decision-making process. Management is responsible for the financial reporting process, including the Company's system of internal controls, for the preparation of consolidated financial statements in accordance with accounting principles generally accepted in the United States and for the report on the Company's internal control over financial reporting. The Company's independent auditor is responsible for auditing those financial statements and expressing an opinion as to their conformity with such accounting principles. PwC was the Company's independent auditor in 2017. The Audit Committee's responsibility is to oversee the financial reporting process and to review and discuss management's report on the Company's internal controls over financial reporting. The Audit Committee relies, without independent verification, on the information provided to it and on the representations made by management, the internal auditors and the independent auditor.

During 2017, the Audit Committee, among other things:

- Reviewed and discussed the Company's quarterly earnings releases, quarterly reports on Form 10-Q and annual report on Form 10-K, including the consolidated financial statements;

- Reviewed and discussed the Company's policies and procedures for financial risk assessment and financial risk management and the major

financial risk exposures of the Company and its business units, as appropriate;

- Reviewed and discussed the annual plan and the scope of work of the internal auditors for 2017 and summaries of the significant reports to management by the internal auditors;

- Reviewed and discussed with management the plans and progress against those plans for remediating material weaknesses and significant deficiencies in internal controls;

- Provided input to the Compensation Committee regarding performance of key finance, internal control and risk management personnel;

- Reviewed and discussed with management their reports on the Company's policies regarding applicable legal and regulatory requirements;

- Reviewed, updated and approved the Audit Committee's charter;

- Became fully independent in compliance with the NYSE transition rules for newly public companies; and

- Met with the CFO, the independent auditor and the internal auditors in separate executive sessions.

The Audit Committee has reviewed and discussed with management, the internal auditors and the independent auditor the audited consolidated financial statements for the year ended December 31, 2017 and the critical accounting policies that are set forth in the Company's annual report on Form 10-K.

The Audit Committee discussed with PwC matters that independent registered public accounting firms must discuss with audit committees under generally accepted auditing standards and standards of the Public Company Accounting Oversight Board (the "PCAOB"), including, among other things, matters related to the conduct of the audit of the Company's consolidated financial statements and the matters required to be discussed by Auditing Standard No. 1301 "Communication with Audit Committees," as adopted by the PCAOB. This review included a discussion with management and the independent auditor of the quality (not merely the acceptability) of the Company's accounting principles, the reasonableness of significant estimates and judgments, and the disclosures in the Company's consolidated financial statements, including the disclosures related to critical accounting policies.

PwC also provided to the Audit Committee the written disclosures and the letter required by applicable requirements of the PCAOB and represented that it is independent from the Company. The Audit Committee discussed with PwC its

independence from the Company and considered whether services it provided to the Company beyond those rendered in connection with its audit of the Company's annual consolidated financial statements included in its annual report on Form 10-K and reviews of the Company's interim condensed consolidated financial statements included in its quarterly reports on Form 10-Q were compatible with maintaining its independence.

The Audit Committee also reviewed and pre-approved, among other things, the audit, audit-related, tax and other services performed by the independent auditor. The Audit Committee received regular updates on the amount of fees and scope of audit, audit-related, tax and other services provided.

Based on the Audit Committee's review and these meetings, discussions and reports discussed above, and subject to the limitations on its role and responsibilities referred to above and in the Audit Committee charter, the Audit Committee recommended to the Board that the Company's audited consolidated financial statements for the year ended December 31, 2017 be included in the Company's annual report on Form 10-K for filing with the SEC. The Audit Committee also selected PwC as the Company's independent auditor for the year ending December 31, 2018, which it believes is in the best interest of the Company and its shareholders, and is presenting that selection to shareholders for ratification at the meeting.

161.    The 2018 Proxy assured stockholders that the Individual Defendants were involved with JELD-WEN's operations, actively monitored the Company's risks and exposures, and acted in an ethical and legal manner. In reality, the Individual Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls, which resulted in the failure to disclose that: (1) JELD-WEN was engaged in anticompetitive conduct through its acquisition of CMI and subsequent conduct towards Independent Door Manufacturers; (2) JELD-WEN purchased CMI with the intention to consolidate market share and "kill off" the competition in the production of interior molded doors; (3) the Individual Defendants entered into long-term supply agreements with Independent Door Manufacturers for the purchase of doorskins to circumvent the DOJ and Independent Door Manufacturers' possible objections to the acquisition of CMI; (4) after Masonite announced that it would no longer sell doorskins, JELD-WEN broke those supply agreements; and (5) because of the foregoing, the Company faced a high probability

of resulting exposure and liability, which Individual Defendants misleadingly represented were not real or actual risks to the Company.

162.    As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to elect Hachigian, Munk, and Wynne to the Board.

163.    The 2018 Proxy was false and misleading because, while it assured investors that JELD-WEN's Code of Business Conduct and its Audit Committee Charter were followed during the preceding fiscal year, the omissions and non-disclosures during the Relevant Period, as outlined herein, demonstrate that the Individual Defendants did not comply with the stated provisions of those documents when filing public statements regarding the affairs of the Company with the SEC.

164.    The 2019 Proxy sought stockholder votes to, among other things, elect Banholzer, Byorum, Maxwell, and Ross to the Board for a three-year term.

165.    The 2019 Proxy assured stockholders that the Board and its committees regularly assessed and managed the risks that JELD-WEN faced, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans.

166.    First, the 2019 Proxy stated:

**Risk Oversight**

Our Board oversees management's enterprise-wide risk management function, both as a collective Board and through its committees. At least annually, the Board reviews strategic risks and opportunities facing the Company. Other important categories of risk are assigned to designated Board committees that report back to the full Board. In general, the committees oversee the following:

| Committee | Primary Areas of Risk Oversight |
|---|---|
| Audit Committee | Risks related to major financial risk exposures, significant legal, regulatory and compliance issues, internal controls and the overall risk assessment and risk management function |

| Compensation Committee | Risks associated with compensation policies and practices, including incentive compensation, and executive succession planning |
| Governance and Nominating Committee | Risks related to corporate governance, effectiveness of Board and committee oversight and review of director candidates, conflicts of interest and director independence, as well as shareholder concerns |

The Audit Committee meets at least quarterly with our Chief Financial Officer, head of Internal Audit, General Counsel and our independent auditor to receive regular updates regarding management's assessment of risk exposures, including liquidity, credit and operational risks such as data privacy and cybersecurity, and the processes in place to monitor such risks and review results of operations, financial reporting and assessments of internal controls over financial reporting.

The Compensation Committee meets at least quarterly to consider management's assessment of employee and compensation risks, monitor incentive and equity-based compensation plans and, at least annually, review the Company's compensation programs to ensure they are appropriately aligned with the Company's strategic direction and avoid incentivizing unnecessary or excessive risk taking.

The Governance and Nominating Committee meets quarterly to oversee risks related to overall corporate governance, including board and committee composition, director candidates and independence matters, and actively engages in overseeing risks associated with succession planning for the Board and senior management.

Our Board believes that the division of risk management responsibilities described above is an effective approach for addressing the risks facing the Company and that our Board leadership structure supports this approach.

167. Second, the 2019 Proxy stated:

**Report of the Audit Committee of the Board**

The Audit Committee operates under a written charter adopted by the Board. The charter is available under the Governance section on the Company's website at *investors.jeld-wen.com*.

The Audit Committee is responsible for the oversight of the integrity of the Company's consolidated financial statements, the Company's system of internal controls over financial reporting, financial risk management, the qualifications and independence of the Company's independent auditor, the performance of the Company's internal auditors and independent auditor, and the Company's compliance with legal and regulatory requirements.

Subject to ratification by the shareholders, the Audit Committee has the sole authority and responsibility to select, determine the compensation of, oversee, evaluate and, when appropriate, replace the Company's independent auditor.

The Audit Committee serves in an oversight capacity and is not part of the Company's managerial or operational decision-making process. Management is responsible for the financial reporting process, including the Company's system of internal controls, for the preparation of consolidated financial statements in accordance with accounting principles generally accepted in the United States and for the report on the Company's internal control over financial reporting. The Company's independent auditor is responsible for auditing those financial statements and expressing an opinion as to their conformity with such accounting principles and effectiveness of the Company's internal control over financial reporting. PwC was the Company's independent auditor in 2018. The Audit Committee's responsibility is to oversee the financial reporting process and to review and discuss management's report on the Company's internal controls over financial reporting. The Audit Committee relies, without independent verification, on the information provided to it and on the representations made by management, the internal auditors and the independent auditor.

During 2018, the Audit Committee, among other things:

- Reviewed and discussed the Company's quarterly earnings releases, quarterly reports on Form 10-Q and annual report on Form 10-K, including the consolidated financial statements;

- Reviewed and discussed the Company's policies and procedures for financial risk assessment and financial risk management and the major financial risk exposures of the Company and its business units, as appropriate;

- Reviewed and discussed the annual plan and the scope of work of the internal auditors for 2018 and summaries of the significant reports to management by the internal auditors;

- Reviewed and discussed with management the plans and progress against those plans for remediating material weaknesses and significant deficiencies in internal controls;

- Reviewed and discussed with management policies with respect to risk assessment and risk management;

- Provided input to the Compensation Committee regarding performance of key finance, internal control and risk management personnel;

- Reviewed and discussed with management their reports on the Company's policies regarding applicable legal and regulatory requirements;

- Reviewed, updated and approved the Audit Committee's charter; and

- Met with the CFO, the general counsel, the independent auditor and the internal auditors in separate executive sessions.

The Audit Committee has reviewed and discussed with management, the internal auditors and the independent auditor the audited consolidated financial statements for the year ended December 31, 2018 and the critical accounting policies that are set forth in the Company's annual report on Form 10-K.

The Audit Committee discussed with PwC matters that independent auditors must discuss with audit committees under generally accepted auditing standards and standards of the Public Company Accounting Oversight Board (the "PCAOB"), including, among other things, matters related to the conduct of the audit of the Company's consolidated financial statements and the matters required to be discussed by Auditing Standard No. 1301 "Communications with Audit Committees," as adopted by the PCAOB. This review included a discussion with management and the independent auditor of the quality (not merely the acceptability) of the Company's accounting principles, the reasonableness of significant estimates and judgments, and the disclosures in the Company's consolidated financial statements, including the disclosures related to critical accounting policies.

168.    The 2019 Proxy assured stockholders that the Individual Defendants were involved with JELD-WEN's operations, actively monitored the Company's risks and exposures, and acted in an ethical and legal manner. In reality, the Individual Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls, which resulted in the failure to disclose that: (1) JELD-WEN was engaged in anticompetitive conduct through its acquisition of CMI and subsequent conduct towards Independent Door Manufacturers; (2) JELD-WEN purchased CMI with the intention to consolidate market share and "kill off" the competition in the production of interior molded doors; (3) the Individual Defendants entered into long-term supply agreements with Independent Door Manufacturers for the purchase of doorskins

to circumvent the DOJ and Independent Door Manufacturers' possible objections to the acquisition of CMI; (4) after Masonite announced that it would no longer sell doorskins, JELD-WEN broke those supply agreements; and (5) because of the foregoing, the Company faced a high probability of resulting exposure and liability, which the Individual Defendants misleadingly represented were not real or actual risks to the Company.

169.    As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to elect Banholzer, Byorum, Maxwell, and Ross to the Board.

170.    The above Proxies were false and misleading because, while they assured investors that JELD-WEN's Code of Business Conduct and its Audit Committee Charter were followed during the preceding fiscal year, the omissions and non-disclosures during the Relevant Period, as outlined herein, demonstrated that the Individual Defendants did not comply with the stated provisions of those documents when filing public statements regarding the affairs of the Company with the SEC.

## **FIDUCIARY DUTIES**

171.    By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continues to owe JELD-WEN and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his or her utmost ability to control and manage JELD-WEN in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of JELD-WEN and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

172.    Each Individual Defendant owes and continues to owe JELD-WEN, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

173.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of JELD-WEN, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with JELD-WEN, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

174.    To discharge their duties, the Individual Defendants were and are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

(b)    conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

(c)    remain informed as to how JELD-WEN conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or

practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(d)    truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

### Duties Pursuant to the Company's Code of Business Conduct and Ethics

175.    The Individual Defendants, as officers and/or directors of JELD-WEN, were bound by the Company's Code of Business Conduct and Ethics[5] (the "Code of Conduct") which required the following:

### FINANCIAL INTEGRITY

The Company expects candor from employees at all levels and full compliance withJELD-WEN's accounting policies and controls. The Board of Directors and senior leadership team care how results are obtained, not just that they are obtained. The Company will not tolerate employees who achieve results by violating the law or dealing unscrupulously.

**Financial Records and Reports**

The Company's books, records, accounts and financial statements must accurately and fairly reflect the assets, liabilities, revenues and expenses of the Company, and conform to applicable legal requirements and accounting standards. Employees may not make any false statements, misleading or artificial entries, or material omissions or misrepresentations in any of the Company's books, financial records, or other documents or communications. All financial transactions must be accurately documented in reasonable detail and recorded in the Company's accounting records. Accruals shall be supported by appropriate documentation and based upongood faith estimates.

**Accounting Controls**

The Company has policies, procedures and practices in place to ensure that adequate internal controls exist over financial reporting, assets are properly

---

[5] *See* JELD-WEN Code of Business Conduct, https://s2.q4cdn.com/714858690/files/doc_downloads/gov_docs/code-of-business-conduct-and-ethics-june-2018.pdf.

safeguarded, transactions are properly authorized, transactions are properly recorded and reported and financial reporting is accurate and complete. All entities worldwide are required to use the Company's standard internal reporting formats, month end dates and universal chart of accounts unless prohibited by local laws. In addition, all reporting units and corporate locations must have internal controls that continually operate effectively to ensure the Company's financial management objectives are achieved. Financial Disclosures made in the Company's public communications and communications with investors must be complete, fair, accurate, timely and understandable. All employees who are involved in the Company's disclosure process, including all senior financial personnel and all employees with supervisory responsibilities with respect to the Company's public disclosure documents, are expected to act in furtherance of this requirement. In particular, these individuals are required to be familiar with and to comply with all applicable disclosure requirements and are prohibited from knowingly misrepresenting, omitting or causing others to misrepresent or omit, material facts about the Company to others, whether inside or outside the Company. Directors, officers and employees should be aware of the Company's procedures for developing and making public disclosure and avoidinginadvertent or selective disclosure to analysts or others contained in the Policies.

***

## COMPLIANCE WITH LAWS

All directors, officers and employees must respect and comply with applicable laws, rules and regulations of all global locations where the Company conducts its business. Since JELD-WEN is based in the United States, **some U.S. laws must be followed in every region of the world where its affiliates and subsidiaries conduct operations or transact business. These laws include**, but are not limited to, **U.S. antitrust laws**, the Foreign Corrupt Practices Act and other U.S. laws that prohibit doing business with individuals and countries that sponsor international terrorism.

### Antitrust Laws

Business activities must be conducted in accordance with applicable antitrust and competition laws. Some of the most serious antitrust offenses are **agreements between competitors that limit independent judgment and restrain trade, such as agreements to fix pricing**, or to divide a market for customers, territories, products or purchases. Any communication with a competitor's representative, no matter how innocent it may seem at the time, **may later be subject to legal scrutiny and form the basis for accusations of improper or illegal conduct**. **Directors, officers and employees should avoid situations from which**

**an unlawful agreement could be inferred.** By bringing competitors together, trade associations can raise antitrust concerns, even thoughsuch groups serve many legitimate goals. **The exchange of sensitive information with competitors regarding topics such as pricing or billing practices can potentially violate antitrust and competition laws and shouldbe avoided.**

*Potential Red Flags:*

- Discussing, communicating (including at industry meetings or in surveys), proposing or entering into any agreements or understandings—express or implied, formal or informal, written or oral—with any competitor regarding:

  - o  pricing;

  - o  **terms or conditions of sale;**

  - o  wages, compensation or benefits information;

  - o  costs, profits or profit margins;

  - o  product or service offerings;

  - o  production, sales capacity or volume;

  - o  market share;

  - o  coordination of bidding activities; or

  - o  dividing sales territories or allocation of customers or product lines.

Exclusive arrangements for the purchase or sale of products or services.

- Bundling of goods and services.

- **Agreements that restrict a customer's choices in using or reselling a JELD-WEN product or service.**

- Technology licensing agreements that restrict the freedom of the licensee or licensor.

- Selective price discounting to only certain customers.

- Distribution arrangements with competitors.

The laws governing this area are complex, and employees should seek counsel from the Law Department whenever appropriate. In particular, the Law Department should be consulted early in the process of evaluating any proposed merger, acquisition or joint venture. The Law Department should also beconsulted in connection with business arrangements that could raise any red flags, including exclusive arrangements for the purchase or sale of products or services and bundling of goods and services.

\*\*\*

**FAIR DEALING**

**Each director, officer and employee shall endeavor to deal fairly and in good faith with the Company's** customers, shareholders, suppliers, regulators, business partners, **competitors** and others. **No director, officer or employee shall take unfair advantage of anyone through** manipulation, concealment, abuse of privileged or confidential information, misrepresentative, fraudulent behavior or any other **unfair dealing practice.**

176.    In addition to these duties, the Audit Committee Defendants, owed specific duties to JELD-WEN under the Audit Committee Charter (the "Audit Charter").[6] Specifically the Audit Charter provided for the following purposes and responsibilities of the Audit Committee Defendants:

**Purpose**

The Audit Committee (the "Committee") is appointed by the Board of Directors (the "Board") of JELD-WEN Holding, Inc. (the "Company") to carry out the duties and responsibilities assigned to the Audit Committee under applicable securities laws and the rules and regulations of the New York Stock Exchange ("NYSE"). The Committee shall assist the Board in monitoring the:

- Quality and integrity of the Company's financial statements, including  its accounting policies and financial reporting and disclosure practices;

- Adequacy of the system of internal controls within the Company to support the financial and business environment;

---

[6] *See* JELD-WEN Audit Committee Charter at:
https://s2.q4cdn.com/714858690/files/doc_downloads/2019/05/Audit-Committee-Charter-(Approved-05092019)-(1).pdf..

- Independence, qualifications and performance of the Company's independent auditor;

- Performance of the Company's internal audit function; and

- Company's compliance with all applicable legal and regulatory requirements.

In carrying out its responsibilities, the guiding principles to be considered by the Audit Committee include:

- Whether the financial statements fairly present the results of operations of the Company in accordance with generally accepted accounting principles;

- Whether the treatment of a particular matter is consistent with the Company's practices in prior accounting periods;

- Whether the presentation of a particular matter is reasonably comprehensive under the circumstances;

- **Whether the disclosure regarding a particular matter contains any material misstatement or fails to disclose a matter which reasonably would be considered material to the Company's stockholders;** and

- Whether the presentation modifies principles of convention or conservatism.

***

## Responsibilities

The Committee has the following duties and responsibilities:

### *Financial Reporting and Disclosure Matters*

1. Review and discuss with management and the independent auditor the Company's annual audited financial statements and quarterly financial statements prior to their public dissemination, as well as the Company's specific disclosures made in management's discussion and analysis, and recommend to the Board whether such financial statements should be included in the Company's Form 10-K or 10-Q, as the case may be.

2. Discuss with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any

significant changes in the Company's selection or application of accounting principles; all alternative treatments within generally accepted accounting principles for policies and practices that have been discussedwith management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor; other materialwritten communications between the independent auditor and management, such as any management letter or schedules of unadjusted differences; any significant issues relating to the adequacy of the Company's internal controls; and any special steps taken or processes adopted in light of any material control weaknesses or significant control deficiencies.

3. Discuss with the independent auditor the matters required to be discussed by PCAOB Auditing Standards relating to the conduct of the audit (or review of the quarterly financial statements), including any difficulties encountered in the course of the audit work and management's response, any restrictions on the scope of activities or on access to requested information, and any significant disagreements with management.

4. Discuss with management the Company's earnings press releases and review the type and presentation of information to be included in such press releases, including the useof "pro forma" or "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to analysts and rating agencies.

5. Prepare, review and approve the "Report of Audit Committee" for inclusion in the Company's proxy statement

***

*Risk Oversight*

19. Discuss with management and the independent auditor the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including the Company's policies with respect to risk assessment and risk management in such areas as foreign exchange, commodities, interest rate exposures, insurance programs and customer financing risks.

20. Oversee and review periodically with management the Company's policies relating to finance, capital expenditures, investment, borrowings, currency exposures, share issuance and repurchases, risk management, asset management, information management, and the security of its intellectual and physical assets, including cybersecurity.

*Internal Controls*

21.   Review disclosures made to the Audit Committee by the Company's CEO and CFO during their certification process for the Form 10-K and Form 10-Q regarding any significant deficiencies or material weaknesses in the design or operation of internal controls and any fraud, whether or not material, that involves management or other employees having a significant role in the Company's internal controls.

22.   Review and discuss with management (including the senior internal auditing officer) and the independent auditor the Company's internal controls report and the independent auditor's attestation report prior to the filing of the Company's Form 10-K.

23.   Review with the independent auditor and management the Company's disclosure controls and procedures and management's assessment of them.

*Compliance Oversight Responsibilities*

24.   Review with the Chief Compliance Officer: (1) the Chief Compliance Officer's annual report on the Company's overall ethics and compliance program; (2) the Company's periodic ethics and compliance risk assessment; and (3) the compliance of the Company with applicable legal requirements and the Company's Code of Business Conduct and Ethics.

25.   Establish procedures for (a) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters; and (b) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters. The Committee shall review any such complaints and shall receive reports regarding the investigation of such complaints.

26.   Review with the General Counsel any legal matters, including litigation and regulatory matters, that could have a significant impact on the Company's financial statements.

27.   Review periodically (at least annually) with the senior tax executive all tax matters affecting the Company's financial performance.

28.   Communicate and work with the Compensation Committee regarding performance goals and evaluations of key finance, internal control, internal audit, and risk management personnel,

including to ensure that performance goals do not encourage taking unnecessary risk.

## BREACHES OF DUTIES

177.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of JELD-WEN, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

178.     The Individual Defendants breached their duty of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to disclosure of material information regarding the true source of its financial success, including truthfully and timely reporting to the market that its financial success during the Relevant Period was not the result of a superior pricing strategy but was, rather, the result of JELD-WEN's unlawful anticompetitive conduct, which would predictably expose the Company to liability.

179.     The Individual Defendants also breached their duty of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused JELD-WEN substantial damage.

180.     The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings. The Audit Committee Defendants breached their duty of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee JELD-WEN's public statements and internal control function.

181.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of JELD-WEN, were able to and did, directly or indirectly, exercise

control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, as a result of the Individual Defendants' improper course of conduct, the Company is now the subject of the Federal Securities Class Action, which alleges violations of federal securities laws. As a result, JELD-WEN has expended, and will continue to expend, significant sums of money in defending itself.

## DAMAGES TO JELD-WEN

182.    The anti-competitive conduct has exposed the Company to myriad reputational and financial damages, including but not limited to: (a) liability arising from the Federal Securities Class Action; (b) liability arising from the Steves & Sons Litigation; (c) the loss of credibility with customers and suppliers; and (d) legal and accounting costs associated with litigation, investigationsand restatements.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

183.    Plaintiff brings this action derivatively and for the benefit of JELD-WEN to redress injuries to the Company from the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of JELD-WEN, waste of corporate assets, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act.

184.    JELD-WEN is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

185.    Plaintiff is, and has been continuously at all relevant times, a stockholder of JELD-WEN. Plaintiff will adequately and fairly represent the interests of JELD-WEN in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to prosecute this action.

186.    Plaintiff incorporates by reference and re-alleges each allegation stated above as if fully set forth herein.

187.    A pre-suit demand on the Board of JELD-WEN is futile and, therefore, excused. At the time of filing of this action, the Board consists of Defendants (i) Ross, (ii) Banholzer, (iii) Byorum, (iv) Maxwell, (v) Michel, (vi) Munk, (vii) Stefany, (viii) Taten, (ix) Wendt and (x) Wynne (the "Director Defendants"). Plaintiff needs only to allege demand futility as to five of the Director Defendants.

188.    Demand is excused as to all the Director Defendants because each of them face, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

189.    In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

190.    Demand on Defendant Ross is futile because Defendant Ross has served as a Company director since October 2011. He has received and continues to receive compensation for his role as a director as described herein. Defendant Ross signed certain of the SEC filings, as outlined herein, and thus personally made the false and misleading statements. For these reasons,

Defendant Ross breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

191.    Demand on Defendant Banholzer is futile because Defendant Banholzer has served as a Company director since 2018. He has received and continues to receive compensation for his role as a director as described herein. Defendant Banholzer signed certain of the SEC filings, as outlined herein, and thus personally made the false and misleading statements. For these reasons, Defendant Banholzer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

192.    Demand on Defendant Byorum is futile because Defendant Byorum has served as the Chairman of the Board since 2018. She also serves on the Audit Committee. Defendant Byorum has received and continues to receive compensation for her role as a director as described herein. Defendant Byorum signed certain of the SEC filings, as outlined herein, and thus personally made the false and misleading statements. For these reasons, Defendant Byorum breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

193.    Demand on Defendant Maxwell is futile because Defendant Maxwell has served as a Company director since 2018. He also serves as the Chair of the Company's Audit Committee. Defendant Maxwell has received and continues to receive compensation for his role as a director as described herein. Defendant Maxwell signed certain of the SEC filings, as outlined herein, and thus personally made the false and misleading statements. For these reasons, Defendant Maxwell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

194.     Demand on Defendant Michel is futile because Defendant Michel has served as a Company director since 2018. Defendant Michel has received and continues to receive compensation for his role as a director as described herein. For the reasons outlined herein, Defendant Michel breached fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

195.     Demand on Defendant Munk is futile because Defendant Munk has served as a Company director since 2018. Defendant Munk has received and continues to receive compensation for his role as a director as described herein. For the reasons outlined herein, Defendant Munk breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

196.     Demand on Defendant Stefany is futile because Defendant Stefany has served as a Company director since 2018. Defendant Stefany also serves on the Audit Committee. Defendant Stefany has received and continues to receive compensation for her role as a director as described herein. Defendant Stefany signed certain of the SEC filings, as outlined herein, and thus personally made the false and misleading statements. For these reasons, Defendant Stefany breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

197.     Demand on Defendant Taten is futile because Defendant Taten has served as a Company director since 2018. Defendant Taten has received and continues to receive compensation for his role as a director as described herein. Defendant Taten signed certain of the SEC filings, as outlined herein, and thus personally made the false and misleading statements. For these reasons, Defendant Taten breached his fiduciary duties, faces a substantial likelihood of

liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

198.   Demand on Defendant Wendt is futile because Defendant Wendt has served as a Company director since 2018. Defendant Wendt has received and continues to receive compensation for his role as a director as described herein. Defendant Wendt signed certain of the SEC filings, as outlined herein, and thus personally made the false and misleading statements. For these reasons, Defendant Wendt breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

199.   Demand on Defendant Wynne is futile because Defendant Wynne has served as a Company director since 2018. He also serves on the Audit Committee. Defendant Wynne has received and continues to receive compensation for his role as a director as described herein. Furthermore, Defendant Wynne signed certain of the SEC filings, as outlined herein, and thus personally made the false and misleading statements. For these reasons, Defendant Wynne breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

200.   As trusted Company directors, the above directors conducted little, if any, oversight of the anticompetitive conduct and the scheme to cause the Company to make false and misleading statements regarding the anticompetitive conduct, consciously disregarded their duties to monitor such controls over reporting, and consciously disregarded their duties to protect corporate assets. For the above reasons, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

201. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's accounting and financial reporting practices and system of internal controls. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Committee Charter, and allowed the Company to issue false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

202. In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Section 14(a) and 20(a) of the Exchange Act. In further violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Conduct. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

## COUNT I

### Against the Individual Defendants
*for Violations of Section 14(a) of the Exchange Act*

203. Plaintiff repeats and re-alleges each and every allegation set forth above, as though fully set forth herein.

204.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

205.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

206.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

207.    The Proxies were also false and misleading because, despite assertions to the contrary, JELD-WEN's compliance with its respective codes of conduct were not followed, as the Individual Defendants made and/or caused the Company to make the false and misleading statements discussed herein.

208.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts concerning the Company's

anticompetitive conduct, the Proxies were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the Proxies, including, but not limited to, election of directors.

209.     The Individual Defendants failed to disclose within the Proxies the true source of the Company's success, namely its anticompetitive conduct. The Proxies failed to disclose that the Company entered into the long-term supply agreements in order to obtain DOJ approval of the CMI Acquisition, and with the clear intention to flout those agreements by driving up the price of doorskins once the CMI Acquisition was complete. In fact, the Company's success during the Relevant Period was largely a result of exploiting its market power by being involved in anticompetitive conduct against other Independent Door Manufacturers as revealed by the Steves & Sons Litigation.

210.     The false and misleading statements in the Proxies led to the re-elections of Director Defendants Munk, Wynne, Banholzer, Byorum, Maxwell, and Ross, allowing them to continue breaching their fiduciary duties to JELD-WEN.

211.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxies.

212.     Plaintiff, on behalf of JELD-WEN, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants
*for Violations of Section 20(a) of the Exchange Act*

213.     Plaintiff repeats and re-alleges each and every allegation set forth above, as though fully set forth herein.

214.     The Individual Defendants, by virtue of their positions with JELD-WEN and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of JELD-WEN and

officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause JELD-WEN to engage in the illegal conduct and practices complained of herein.

215.    Plaintiff, on behalf of JELD-WEN, has no adequate remedy at law.

## COUNT III

### Against Individual Defendants
*for Breach of Fiduciary Duties*

216.    Plaintiff repeats and re-alleges each and every allegation set forth above, as though fully set forth herein.

217.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of JELD-WEN's business and affairs.

218.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

219.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of JELD-WEN.

220.    In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the misconduct described herein.

221.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure, controls, and procedures.

222.    Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly made and/or caused the Company to make materially false and misleading statements

during the Relevant Period, and/or failed to disclose that: (1) JELD-WEN was engaged in anticompetitive conduct through its acquisition of CMI and subsequent conduct towards Independent Door Manufacturers; (2) JELD-WEN purchased CMI with the intention to consolidate market share and "kill off" the competition in the production of interior molded doors; (3) Individual Defendants entered into long-term supply agreements with Independent Door Manufacturers for the purchase of doorskins to circumvent the DOJ's and the Independent Door Manufacturers' possible objections to the acquisition of CMI; (4) after Masonite announced that it would no longer sell doorskins, JELD-WEN broke those supply agreements; and (5) because of the foregoing, the Company faced a high probability of resulting exposure and liability, which Individual Defendants misleadingly represented were not real or actual risks to the Company.

223.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

224.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committedknowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

225.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, and that

internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

226.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

227.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, JELD-WEN has sustained and continues to sustain significant damages.

228.    Plaintiff, on behalf of JELD-WEN, has no adequate remedy at law.

## COUNT IV

### Against Individual Defendants
*for Unjust Enrichment*

229.    Plaintiff repeats and re-alleges each and every allegation set forth above, as though fully set forth herein.

230.    By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of JELD-WEN.

231.    The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from JELD-WEN tied to the performance or artificially inflated

valuation of JELD-WEN, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

232.     Plaintiff, as a stockholder and a representative of JELD-WEN, seeks restitution from the Director Defendants and seeks an order from this Court disgorging all profits—including benefits, performance-based, valuation-based, and other compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

233.     Plaintiff, on behalf of JELD-WEN, has no adequate remedy at law.

### COUNT V

**Against Individual Defendants**
*for Waste of Corporate Assets*

234.     Plaintiff repeats and re-alleges each and every allegation set forth above, as though fully set forth herein.

235.     As a further result of the foregoing, the Company has incurred approximately $75 million in liability from the Steves & Sons Litigation and will incur many millions of dollars of legal liability and/or costs to defend unlawful actions and engage in internal investigations, and JELD-WEN will lose financing from investors and business from future customers who no longer trust the Company and its products.

236.     Because of the waste of corporate assets, the Individual Defendants are each liable to the Company.

237.     Plaintiff, on behalf of JELD-WEN, has no adequate remedy at law.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.      Declaring that Plaintiff may maintain this action on behalf of JELD- WEN, and that Plaintiff is an adequate representative of the Company;

B.      Finding that the Individual Defendants have breached their fiduciary duties to JELD-WEN;

C.      Awarding damages to JELD-WEN which it sustained because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

D.      Directing JELD-WEN and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect JELD-WEN and its stockholders from a repeat of the damaging events described herein;

E.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court may deem just and proper.

Dated: May 10, 2021                              Respectfully submitted,

                                                 **BIELLI & KLAUDER, LLC**

                                                 */s/ Ryan M. Ernst*_____
                                                 David M. Klauder (No. 5769)
                                                 Ryan M. Ernst (No. 4788)
                                                 1204 N. King Street
                                                 Wilmington, DE 19801
                                                 (302) 803-4600
                                                 dklauder@bk-legal.com
                                                 rernst@bk-legal.com

**LEVI & KORSINSKY, LLP**
Gregory M. Nespole
Daniel Tepper
Correy Kamin
Ryan Messina
55 Broadway, 10th FloorNew
York, NY 10006
(212) 363-7500
gnespole@zlk.com
dtepper@zlk.com
ckamin@zlk.com
rmessina@zlk.com

*Attorneys for Plaintiff Jason Aldridge*